## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF WISCONSIN

*In re*:

GEORGE W. CONWAY
and ELLEN CONWAY,

Case No. 24-10126-7

Debtors.

### DECISION ON TRUSTEE'S OBJECTION TO DEBTORS' CLAIMS OF EXEMPTIONS

George and Ellen Conway ("Debtors") filed a voluntary Chapter 7 petition. Chapter 7 Trustee Brian Hart objected to Debtors' claimed exemptions. The Court held a preliminary hearing on the objection at which the parties stated a need for discovery. The Court set the hearing over and later extended the discovery deadline at the adjourned hearing. Before a further adjourned hearing, Debtors moved to convert their Chapter 7 case to Chapter 13. Trustee Hart and the United States Trustee objected to conversion. Meanwhile, the Court issued a decision declaring that judgment creditor Greenwich Business Capital, LLC, was unsecured and that it did not hold a valid lien on homestead sale proceeds being held at a title company. The Court then held concurrent evidentiary hearings on Trustee Hart's objection to exemptions and Debtors' motion to convert on March 13 and 14. The Court will deny Mr. Conway's homestead exemption but finds that Mrs. Conway can claim the exemption.

## FACTS

Debtors were married in Illinois in 1986. At some point they moved to Connecticut and purchased a residence. They then sold their Connecticut property and used the proceeds for a down payment on a house located at 2201 Mica Road in Madison, Wisconsin (the "Property") in 2003.[1] George Conway filed Chapter 7 bankruptcy in this district in 2005 and received a discharge in 2007.[2] Later, in 2011, Debtors refinanced their mortgage on the Property with a loan from Associated Bank.[3]

Mr. Conway formed Muldoon Dairy, Inc., in 1995.[4] Through Muldoon Dairy, Mr. Conway exported cheese, acting as a broker between domestic producers and international buyers. Muldoon Dairy stopped doing business in 2020 and 2021 due to the COVID-19 pandemic. Mr. Conway testified that around this time he was approached by an individual (or group of individuals) claiming to be linked to the United Nations, who wanted to work with Muldoon Dairy to aid humanitarian efforts overseas.

Believing this group to be legitimate, Mr. Conway paid alleged export and shipping fees with the understanding he would be repaid for these fees and for

---

[1] Debtors' Exhibits, ECF No. 222, Ex. 104.

[2] Case No. 05-21158.

[3] Debtors' Exhibits, ECF No. 222, Ex. 114.

[4] George Conway testified that he formed Muldoon Dairy, Inc., in 1995. The Wisconsin Department of Financial Institutions' website shows that the entity was first registered in Wisconsin in October 2005. WIS. DEP'T FIN. INST., https://apps.dfi.wi.gov/apps/corpSearch/Results.aspx?type=Simple&q=Muldoon+Dairy+LLC (last visited Mar. 25, 2025).

product fees. He directed Muldoon Dairy to borrow $310,400 from Greenwich Business Capital, LLC ("Greenwich") to help finance these payments.[5] The money was loaned in three notes, each of which Mr. Conway personally guaranteed. Muldoon Dairy and Mr. Conway made some payments on the notes but defaulted in summer 2022. The parties entered into a settlement agreement in August 2022, in which Muldoon Dairy and Mr. Conway agreed to pay a total of $235,000 in weekly installments of $1,000.[6] But they soon defaulted on those payments too.

On March 24, 2023, Mr. Conway quitclaimed his interest in the Property to his wife, co-debtor Ellen Conway.[7] Mr. Conway anticipated litigation from Greenwich due to defaulting on the loans. He quitclaimed his interest in the Property to his wife on the advice of his legal counsel, Attorney Jonathan Goodman.[8] Mr. Conway believed, on Attorney Goodman's advice, that quitclaiming his interest would protect Mrs. Conway and the Property from possible liability to Greenwich. Mr. Conway also says he believed, on Attorney Goodman's advice, that he would retain an interest in the Property despite the quitclaim.

---

[5] Trustee's Exhibits, ECF No. 225, Ex. 4.

[6] *See* Debtors' Exhibits, ECF No. 222, Ex. 101, Greenwich UCC Financing Statement filed 05/15/2023, attaching Rhode Island complaint. In the Rhode Island complaint, Greenwich mistakenly says that the parties settled in August 2023, but the complaint itself was only filed in May 2023.

[7] Trustee's Exhibits, ECF No. 225, Ex. 1.

[8] Attorney Goodman also represents Debtors in the bankruptcy proceeding including this contested matter.

He confirmed that he intended to transfer his legal interest in the Property in an email to his lender, Associated Bank. In the email, Mr. Conway said, "I here by wish to transfer my ownership in [the Property] to my wife Ellen Conway. Ellen will be the sole owner of the property."[9] The Quit Claim Deed was recorded with the Dane County Register of Deeds in June 2023.[10] These actions were intended to remove any interest in the Property that Mr. Conway had to keep any equity out of the hands of Greenwich.

After executing the Quit Claim Deed, Attorney Goodman also told Debtors to sell the Property to protect Mrs. Conway and their home equity from potential liability to Greenwich. To that end, in April 2023 Debtors borrowed $40,000 to renovate the Property and pay for movers.[11] But this $40,000 loan included an $18,000 origination fee, and total loan costs and fees of $19,153.75, leaving just $20,846.25 to Debtors.[12] And Debtors used just $6,185.90 to improve the Property.[13]

Greenwich sued Mr. Conway and Muldoon Dairy in Rhode Island state court on May 9, 2023. Greenwich filed a UCC Financing Statement with the Dane County Register of Deeds on May 15, attaching a copy of the Rhode Island complaint.[14] Mr. Conway testified that this filing prevented Debtors from

---

[9]  Trustee's Exhibits, ECF No. 225, Ex. 2.

[10] Trustee's Exhibits, ECF No. 225, Ex. 1.

[11] Trustee's Exhibits, ECF No. 225, Ex. 3.

[12] Trustee's Exhibits, ECF No. 225, Ex. 3.

[13] Trustee's Exhibits, ECF No. 225, Ex. 20.

[14] Debtors' Exhibits, ECF No. 222, Ex. 101.

selling the Property to an interested buyer at the time, since it appeared to be a cloud on the title.

In June 2023, Debtors sued Greenwich in Dane County Circuit Court seeking to challenge the UCC in a declaratory judgment action.[15] Attorney Goodman moved for default judgment, but he failed to pursue notice or timely file any proof that the summons and complaint were served on Greenwich.[16] Without the proof of service, the state court dismissed the action.

On July 24, Greenwich obtained a default judgment in the Rhode Island action for $248,272.77.[17] Mrs. Conway was not a defendant, and no judgment was granted against her. Greenwich filed a second UCC Financing Statement ("UCC") with the Dane County Register of Deeds on August 8 in a flawed attempt to obtain a judgment lien against the Property.[18] The UCC identified Mr. Conway as the Debtor and Greenwich as a secured creditor with an interest in the Property.

Mrs. Conway then sought to sell the Property to a third party, Kristine Devilbiss, in another effort to protect the home equity. But the second UCC filed by Greenwich was identified as a possible encumbrance by

---

[15] Dane County Circuit Court, Case No. 2023CV1453.

[16] At trial, Attorney Goodman and Mr. Conway both stated that Greenwich was in fact served, but that the process server returned proof of the service in an email to Mr. Conway. Mr. Conway forwarded the proof of service to Attorney Goodman, but Attorney Goodman "missed it."

[17] Debtors' Exhibits, ECF No. 222, Ex. 100.

[18] *See Hart v. Greenwich Business Capital, LLC*, Adv. Proc. No. 24-34, Decision on Plaintiff's Motion for Summary Judgment.

Commonwealth Land Title Insurance Company ("Commonwealth").[19] On

September 5, as the sole titleholder, Mrs. Conway conveyed her interest in the

Property to Ms. Devilbiss.[20] A correction deed was filed on September 8 to

include the conveyance of any interest held by Mr. Conway in the Property.[21]

Due to the uncertainty created by Greenwich's UCC, Commonwealth

required Debtors to enter into a Secured Indemnity Agreement ("Agreement").

Attorney Goodman, on Debtors' behalf, negotiated the language of the

Agreement with Commonwealth's counsel, Duane Wunsch.[22]

Under the Agreement, Debtors delivered $227,316.52 of the proceeds

from the sale of the Property (the "Funds") to Commonwealth. The purpose of

the Agreement was to allow Commonwealth to use the Funds to protect itself

and Ms. Devilbiss from claims that could arise from the uncertainty created by

the UCC. The Agreement provides in part, "The Funds are, notwithstanding

that the Funds consist of and include proceeds exempt from execution, from

the lien of every judgment, and from liability for the debts of the owner to the

amounts of up to $75,000 or $150,000, under Sec. 815.20, Stats., Wisconsin

Statutes, agreed to be the property of Commonwealth while held by it enabling

Commonwealth to insure against the Identified Risk," *i.e.*, the UCC, and are "to

---

[19] Commonwealth is a subsidiary of Fidelity National Financial, Inc. Another
subsidiary, Land Title Services, Inc., was also involved in the sale.

[20] Debtors' Exhibits, ECF No. 222, Ex. 102; Trustee's Exhibits, ECF No. 225, Ex. 9.

[21] *Id.*

[22] *See, e.g.*, Debtors' Exhibits, ECF No. 222, Ex. 113; Trustee's Exhibits, ECF No. 225,
Ex. 6, 13, 14. Mr. Wunsch is state counsel for Fidelity National Title Group,
Commonwealth's parent company.

be used for the benefit of Commonwealth and its insured(s)."[23] The Agreement

goes on to state that "the [Debtors] acknowledg[e] that it is not an insured or a

third-party beneficiary of a policy issued by Commonwealth, that the Funds are

not its property, and its only interest in the Funds is a conditional right to

receive all or the surplus of the Funds, if any, including any accrued but

unused interest," after the "Identified Risk is paid, discharged, satisfied or

removed from the title to Commonwealth's satisfaction."[24]

    Mr. Wunsch testified at trial that Commonwealth's standard practice in

secured indemnity agreements is to clarify that it owns funds while it holds

them. He explained that, as a title insurer, Commonwealth needs access to

cash to use to defend against enforcement actions. In this case, Mr. Wunsch

stated that the Funds belonged to Commonwealth while it held them, and that

Debtors had the right to receive the Funds after Greenwich's UCC was

extinguished.

    About four months after the sale, on November 17, 2023, Greenwich

docketed the Rhode Island judgment in Dane County Circuit Court in an effort

to comply with the Uniform Enforcement of Foreign Judgments Act. It also

pursued various judgment enforcement actions against Debtors and the

Funds.

    Debtors filed their voluntary Chapter 7 petition on January 24, 2024, a

little more than two months after Greenwich docketed its judgment. In

---

[23] Trustee's Exhibits, ECF No. 225, Ex. 8, p. 2.

[24] *Id.*

Schedule C of their schedules of assets and liabilities, Debtors claimed a

homestead exemption in the Funds of $150,000. On the petition date,

Commonwealth owned and remained in possession of the Funds under the

Secured Indemnity Agreement subject to return of the Funds on the release,

removal, or discharge of the UCC.

On May 6, 2024, both Greenwich and the Chapter 7 Trustee, Brian Hart,

objected to Debtors' claimed homestead exemption of the Funds. The Court

held two preliminary hearings on Trustee Hart's objection, wherein the parties

discussed the need for discovery and mentioned that they were in settlement

talks. But in September, Debtors moved to convert their case to Chapter 13

and filed a proposed settlement agreement with Greenwich.

Trustee Hart and the United States Trustee objected to conversion.

Trustee Hart also sued Greenwich seeking a determination that Greenwich was

an unsecured creditor and did not hold a valid security interest in the Funds.

The Court set over the motion to convert and Trustee Hart's objection to

exemptions until after the resolution of Trustee Hart's pending adversary

proceeding filed against Greenwich. On December 19, 2024, this Court issued

a decision determining that Greenwich did not have a valid security interest in

the Funds and thus is an unsecured creditor of Debtors.[25] As a result, Debtors'

proposed settlement agreement with Greenwich was also denied. With the

conclusion of the adversary, the Court held concurrent evidentiary hearings on

---

[25] *See supra* n.18.

Trustee Hart's objection to exemptions and Debtors' motion to convert on March 13 and 14, 2025.

## DISCUSSION

Debtors elected to use Wisconsin exemptions. Wisconsin's homestead exemption is found in Wis. Stat. § 815.20, which provides:

> An exempt homestead as defined in s. 990.01 (14) selected by a resident owner and occupied by him or her shall be exempt from execution, from the lien of every judgment, and from liability for the debts of the owner to the amount of $75,000, except mortgages, laborers', mechanics', and purchase money liens and taxes and except as otherwise provided. The exemption shall not be impaired by temporary removal with the intention to reoccupy the premises as a homestead nor by the sale of the homestead, but shall extend to the proceeds derived from the sale to an amount not exceeding $75,000, while held, with the intention to procure another homestead with the proceeds, for 2 years. The exemption extends to land owned by husband and wife jointly or in common or as marital property, and each spouse may claim a homestead exemption of not more than $75,000. The exemption extends to the interest therein of tenants in common, having a homestead thereon with the consent of the cotenants, and to any estate less than a fee.

"Wisconsin has a public policy of protecting the homestead exemption and homestead statutes have enjoyed particularly liberal construction." *In re Laube,* 152 B.R. 260, 261 (Bankr. W.D. Wis. 1993) (citations omitted). Thus, "[a]s stated by the Wisconsin Court of Appeals, 'homestead statutes are remedial legislation and, as such, are to be liberally construed in favor of the debtor.'" *Id.* (citing *State Central Credit Union v. Bigus,* 101 Wis. 2d 237, 304 N.W.2d 148 (Wis. Ct. App. 1981)). Additionally, under Fed. R. Bankr. P. 4003(c), "the objecting party has the burden of proving that an exemption was not properly claimed."

Mr. Conway cannot exempt the Funds under Wis. Stat. § 815.20 because he didn't own the Property when it was sold. He repudiated his ownership interest in the Property. Mrs. Conway, however, can exempt her interest in the Funds because, first, the Secured Indemnity Agreement did not fully deprive her of her interest in the Funds held by Commonwealth. And second, Trustee Hart did not carry his burden of proving that the Funds weren't properly claimed as exempt under Fed. R. Bankr. P. 4003(c) because Mrs. Conway credibly testified that she intended to reinvest the Funds within two years.

1.   Mr. Conway Cannot Exempt the Funds Under Wis. Stat. § 815.20.

Mr. Conway cannot claim a homestead exemption because he did not own the Property when it was sold and so cannot extend the exemption to the proceeds. Mr. Conway quitclaimed his interest in the Property to Mrs. Conway on March 24, 2023, and recorded the Quit Claim Deed with the Dane County Register of Deeds on June 15. The Deed specifies that it is homestead property.[26] He intended that Mrs. Conway would be the sole owner of the Property. He did not own any real estate on the petition date.

Evidence from trial includes an exhibit which shows an email from Mr. Conway to Associated Bank which states: "I here by wish to transfer my ownership in the property at 2201 Mica Rd. Madison, WI 53719 to my wife Ellen Conway. Ellen will be the sole owner of the property."[27] This confirmed

---

[26] Trustee's Exhibits, ECF No. 225, Ex. 1.

[27] Trustee's Exhibits, ECF No. 225, Ex. 2.

his intention to relinquish and release any interest he may have had in the Property.

Mrs. Conway then conveyed the Property to Ms. Devilbiss on September 5, 2023, via a Warranty Deed.[28] The Warranty Deed was recorded on September 7. On September 8, the parties filed a Correction Instrument to include Mr. Conway's signature as the "spouse of Grantor," *i.e.*, Mrs. Conway.[29]

To be eligible for the homestead exemption under Wis. Stat. § 815.20, a person must own and occupy the homestead. Only if these two requirements are met can the exemption extend to the proceeds derived from the sale of the homestead. As this Court explained in *In re Roen*, 556 B.R. 401 (Bankr. W. D. Wis. 2016):

> Wis. Stat. § 815.20 allows a "resident owner" to claim an exemption in a homestead in the amount of $75,000. The exemption "extends to land owned by husband and wife jointly or in common or as marital property," and if this condition is satisfied, then each spouse may claim a homestead exemption of not more than $75,000. Homestead exemptions are usually "liberally construed in favor of the debtor." *In re Coenen*, 487 B.R. 539, 541 (Bankr. W.D. Wis. 2012). Still, in order for each spouse to assert an exemption, each must be the owner of the real estate either jointly, as tenants in common, or as marital property. "The most basic requirement of the homestead exemption is ownership of the property; the statute provides in unambiguous terms that the property must be selected by a 'resident owner and occupied by him.'" *Id.* (quoting *In re Arnhoelter*, 431 B.R. 453, 454 (Bankr. E.D. Wis. 2010)). If the debtor is not the title owner of the property, he may not claim a homestead exemption even if he resides there. *Id.*

---

[28] Trustee's Exhibits, ECF No. 225, Ex. 9, p. 5.

[29] The Correction Instrument attaches a Warranty Deed conveying the Property from Mrs. Conway to Kristine Devilbiss labeled as "Exhibit A," but includes signatures from Ellen and George dated 8/29/2023. Trustee's Exhibits, ECF No. 225, Ex. 9, p. 2.

556 B.R. at 404.

Debtors argue against this Court's ruling in *Roen*, saying that Wis. Stat. § 815.20 doesn't specify that a debtor needs to hold title to real property to claim the homestead exemption. They argue that since "legal title" isn't specified in the statute, then the Legislature's intent must be that legal title isn't required. Attorney Goodman reiterated this argument in his closing argument at trial. Debtors also highlight Wis. Stat. § 706.02(1)(f), which states that where a homestead is to be conveyed, a non-titled spouse must execute the conveyance. This, they say, shows that a non-titled spouse maintains ownership rights in a homestead.

Debtors also say that, during their marriage and while occupying the property as their homestead, Mr. Conway mixed his assets with Mrs. Conway by contributing over $75,000 of the purchase price for the property and in making monthly principal payments on the mortgage.

This argument, however, fails for several reasons. First, the source of the funds to purchase the property is not relevant to ownership on the petition date. In this case, it is the ownership at the time of sale that is determinative of ownership. Mixing is a community or marital property concept related to the combination of nonmarital and marital property. While perhaps there was some separate property of either Mr. or Mrs. Conway brought into Wisconsin and used to purchase the Property in 2003, the only testimony was that proceeds from the sale of "family property" in Connecticut were used to

12

purchase the Property. It was only in argument—and not evidence—that the
source was Mr. Conway.

Second, 20 years passed after the purchase. There was a refinancing.
Any funds used toward the Property after its purchase were by definition
owned by both Debtors. No evidence of "mixing" was presented.

Third, Mr. Conway's recent acts unequivocally show his intent to remove
himself as an owner of the property. He quitclaimed his interest in the Property
to Mrs. Conway in March 2023 to prevent Greenwich from attaching a lien to
the Property. He wanted to insulate the Property from his potential liability to
Greenwich and confirmed his intent to transfer his ownership of the Property
in an email to his lender.[30] If, as Attorney Goodman now suggests, the
quitclaim merely changed bare legal title, it would not have been enough to put
any interest in the Property beyond the reach of Greenwich. Further, if the
quitclaim was a mere artifice, then it would raise questions about good faith.
And that could put the conveyance of his interest into the realm of a fraudulent
transfer.

This Court allowed a homestead exemption to a debtor who recently
divorced her ex-spouse. *In re Nordgaard*, No. 23-10491-7, 2023 WL 8261353
(Bankr. W.D. Wis. Nov. 29, 2023). This Court noted that the debtor remained
on title to the property on the petition date, and that she refused to quitclaim
her interest in real property to her ex-spouse until he provided an equalization

---

[30] *See* Trustee's Exhibits, ECF No. 225, Ex. 2.

payment ordered by the divorce court. The "transactional nature of the transfer of the homestead [was] sufficient to show that Debtor intended to preserve her rights and interests in the homestead until [her ex-spouse] complied with the judgment of divorce." 2023 WL 8261353, at *3.

Here, the inverse occurred: Mr. Conway relinquished his interest in the Property to Mrs. Conway via a Quit Claim Deed and stated his intent to remove himself as an owner. As noted by the Trustee, Mr. Conway presumably made this decision to insulate the Property from the potential liability he foresaw because of the Greenwich litigation against him. But in a clear about-face, he now argues that he is in fact an owner and entitled to the homestead exemption. He simply can't have it both ways.

Between the time that Mr. Conway conveyed his interest to Mrs. Conway in March 2023 to when the Property was sold that September, the Property was not converted to marital property either. At trial, Attorney Goodman hinted that between the Quit Claim Deed in March 2023 and the sale to Ms. Devilbiss that September, such a conversion had occurred. He argued that Mr. Conway contributed money to the Property, thus converting it back into marital property. This argument presumably rests on Wis. Stat. § 766.63, which provides that:

> (1) [M]ixing marital property with property other than marital property reclassifies the other property to marital property unless the component of the mixed property which is not marital property can be traced.
>
> (2) Application by one spouse of substantial labor, effort, inventiveness, physical or intellectual skill, creativity or managerial activity to either spouse's property other than marital property

14

creates marital property attributable to that application if both of
the following apply:

(a) Reasonable compensation is not received for the application.

(b) Substantial appreciation of the property results from the
application.

The argument fails. "[M]arital property interest [cannot] be *created* by the
mere payment of taxes or other maintenance expenses." *Krueger v. Rodenberg*,
190 Wis. 2d 367, 376, 527 N.W.2d 381 (Wis. Ct. App. 1994). Any income of
either spouse used was marital property. Further, no evidence was presented
that any individual property of Mr. Conway was used and so there was no
"mixing." Simply adding funds to improve the homestead before sale did not
transform the Property from Mrs. Conway's individual property into marital
property. Even if the improvements added value to the Property, the marital
estate would be limited to the amount of that value. *See id.* (explaining how the
court in *In re Estate of Kobylski v. Hellstern*, 178 Wis. 2d 158, 173, 503 N.W.2d
369 (Wis. Ct. App. 1993) "limit[ed] the reimbursement to the marital estate to
the enhanced value of the property attributable to the improvements").

Finally, the argument of Debtors' attorney seems to be that, because the
Property was occupied by Debtors at the time of sale, it should be considered
their homestead regardless of title. While title often simply denotes
management and control and not classification, the presumption that
something is marital property is a rebuttable presumption. Wis. Stat.
§ 766.51(5).

The title to the Property was originally in the names of both Debtors. This
certainly indicated it was marital property since it was acquired after marital

15

property became effective in Wisconsin. Then there was a change in title that is relevant to classification. Mr. Conway took the affirmative step of changing title by signing and recording the Quit Claim Deed. The intention that the Deed would change the asset from marital property to the separate property of Mrs. Conway was confirmed in the correspondence with the Bank stating he intended her to "be the sole owner of the property."

"Spouses may reclassify their property by gift, conveyance, as defined in s. 706.01(4), signed by both spouse . . . ." Wis. Stat. § 766.31(10). A conveyance is simply "a written instrument, evidencing a transaction governed by this chapter, that satisfies the requirements of s. 706.02, subject to s. 706.25." Wis. Stat. § 706.01(4).

Effectively, the transfer of his interest in the Property was a gift from one spouse to the other. It was completed on the filing of the Quit Claim Deed. A completed gift from one spouse to the other after the determination date that was intended to be Mrs. Conway's individual property reclassifies the Property as Mrs. Conway's individual property. So the quitclaim was a conveyance that satisfied the requirements of section 706.01(4).

For these reasons, the Court concludes that Mr. Conway knowingly and intentionally conveyed to Mrs. Conway his interest in the Property and agreed it was her separate property. Thus, the Property was reclassified before the sale by Mrs. Conway and all proceeds from the sale were her separate property. For these reasons, Mr. Conway is not entitled to a homestead exemption.

2.  <u>Mrs. Conway is Entitled to a Homestead Exemption</u>.

If a debtor is an owner and occupant of a property, then they can extend

the exemption of Wis. Stat. § 815.20 "to the proceeds derived from the sale to

an amount not exceeding $75,000, while held, with the intention to procure

another homestead with the proceeds, for 2 years." Generally, the petition date

is the date at which a claim to exemption is determined. *In re Coenen*, 487 B.R.

539, 541 (Bankr. W.D. Wis. 2012); *see also In re Olsen*, 322 B.R. 400, 406

(Bankr. E.D. Wis. 2005) (the petition date is generally a "snapshot" for

determination of the law and facts related to exemptions).

At the time of the sale to Ms. Devilbiss, Mrs. Conway was the owner and

resided in the Property. She testified that it was her intention to reinvest the

Funds from the sale in a new residence. It was the circumstances created by

Greenwich's UCC that resulted in the need to enter into the Secured Indemnity

Agreement with Commonwealth. It was the delay, failure to file proof of service,

and ineffectual actions by Attorney Goodman in the state court action to clear

that potential cloud that impeded her ability to control and reinvest the Funds

in a new home. Still, there is a window for Mrs. Conway to reinvest the Funds.

The Trustee's view is that Mrs. Conway cannot exempt the Funds for

some of the same reasons that Mr. Conway cannot do so. First, she didn't have

possession of the Funds on the petition date, nor were they in her control.

Second, she didn't reside in the Property on the petition date. And third, there

was no evidence—other than her testimony—that she intends to use the Funds

to procure another homestead. Still, there was no evidence presented to challenge her testimony about her intentions.

A feeble attempt was undertaken by Attorney Goodman on behalf of Debtors to resolve the risk the Greenwich UCC created. That attempt was the filing of a slander of title action in Dane County Circuit Court in June 2023 and an amended complaint in September 2023. It was ineffective because of a lack of proof of service despite the filing of a motion for default judgment. These missteps resulted in a dismissal without prejudice of that action. As a result, no effective steps were taken by Debtors or Attorney Goodman to avoid the UCC and free up the proceeds so they could be used to acquire another residence.

Yet under Fed. R. Bankr. P. 4003(c), "the objecting party has the burden of proving that an exemption was not properly claimed." And in Wisconsin, "homestead statutes are remedial legislation and, as such, are to be liberally construed in favor of the debtor." *In re Carter*, 550 B.R. 433, 436 (Bankr. W.D. Wis. 2016) (citing *State Central Credit Union v. Bigus*, 101 Wis. 2d at 304). And "[u]nder Wisconsin law, there is a presumption that the property a debtor selects as the homestead for purposes of the exemption is, in fact, homestead property." *Carter*, 550 B.R. at 436 (citing *Moore v. Krueger*, 179 Wis. 2d 449, 507 N.W.2d 155, 159 (Wis. Ct. App. 1993)). Thus, there is a liberally construed presumption that Mrs. Conway's claimed exemption is valid, and the burden is on Trustee Hart to demonstrate that it is not. Other than the language of the

Agreement, the Trustee presented no evidence to challenge a homestead exemption by Mrs. Conway.

The Secured Indemnity Agreement that Debtors created with Commonwealth states that "[t]he Funds are, notwithstanding that the Funds consist of and include proceeds exempt from execution, from the lien of every judgment, and from liability for the debts of the owner to the amounts of up to $75,000 or $150,000, under Sec. 815.20, Stats., Wisconsin Statutes, agreed to be the property of Commonwealth while held by it enabling Commonwealth to insure against the Identified Risk," *i.e.*, the UCC, and are "to be used for the benefit of Commonwealth and its insured(s)."[31] It also states that "the [Debtors] acknowledg[e] that [they are] not an insured or a third-party beneficiary of a policy issued by Commonwealth, that the Funds are not [their] property, and [their] only interest in the Funds is a conditional right to receive all or the surplus of the Funds, if any, including any accrued but unused interest," after the "Identified Risk is paid, discharged, satisfied or removed from the title to Commonwealth's satisfaction."[32]

But Commonwealth didn't have unfettered authority to use the Funds for whatever it chose. The scope of Commonwealth's authority to use the Funds was strictly limited to defending itself against a claim under the UCC, or to removing the UCC itself. Even though Commonwealth could use the Funds for

---

[31] *See* Debtors' Exhibits, ECF No. 222, Ex. 103, p. 2; Trustee's Exhibits, ECF No. 225, Ex. 8, p. 2.

[32] *Id.*

its benefit, that use was narrowly prescribed to apply only to actions relating to

the UCC. Commonwealth could not, for example, use the Funds to provide a

dividend to shareholders or make payments on a lease for its corporate office

space. Commonwealth's attorney, Duane Wunsch, even testified that there

were several possibilities for Commonwealth's use of the Funds, but they all

centered on the risk that Greenwich would assert an interest.

Moreover, Mr. Wunsch testified that the "notwithstanding" language in

the Agreement incorporating Wis. Stat. § 815.20 was added because

Commonwealth didn't want to endanger the idea that the Property was an

exempt homestead. He also testified that whether or not the UCC created a

security interest, the judgment that supported a claim against Mr. Conway

could not create a lien to the extent of any allowable homestead exemption.

It was clear that some portion of the funds subject to the Agreement

would not be available to Greenwich. The reason for the Agreement was to

protect Commonwealth and Ms. Devilbiss if claims were brought against them

related to the sale and its proceeds. All the same, Commonwealth understood

that it would eventually release at least some part of the Funds to Debtors. The

Agreement contains limitations indicating that "[t]he Funds are . . . agreed to

be the property of Commonwealth while held by it enabling Commonwealth to

insure against the Identified Risk."[33] So the use of the Funds was

circumscribed. And once the UCC was discharged or removed from the title, all

---

[33] Trustee's Exhibits, ECF No. 225, Ex. 8, p. 2.

Funds or surplus Funds that remained were to be returned and released to Debtors.[34]

Debtors concede that the Funds were property of Commonwealth on the petition date in their proposed findings of fact: "Amongst other things, the Secured Indemnity Agreement stated that the escrow funds notwithstanding the fact that up to $150,000.00 of the escrowed funds were exempt under §815.20, Debtors agreed that what [sic] while [Commonwealth] held the funds, that the funds were the property of [Commonwealth], which enabled [Commonwealth] to insure over the renegade UCC-1."[35] Yet this statement simply confirms that there was a circumscribed limit on the Funds in the possession of Commonwealth.

At trial, Mrs. Conway believed that she (and her husband) still retained an ownership interest. Mrs. Conway, in particular, stated that she never believed her homestead exemption was in jeopardy at all. So even if Commonwealth held the proceeds on the petition date with the right to use proceeds to resolve the Greenwich UCC claim in its sole discretion, it could not use the Funds for any purpose other than its costs associated with the Greenwich UCC and resolving that claim. Mrs. Conway intended to retain an ownership interest in the Funds, at least to the extent of her homestead

---

[34] *Id.*

[35] Debtors' Findings of Fact and Conclusions of Law, ECF No. 216, p. 3. Further, however, there is a different signed agreement dated August 31, 2023, that omits any reference to a homestead exemption. ECF No. 225, Ex. 13, p. 2.

exemption, and Commonwealth agreed that on the discharge, satisfaction, or release of the Greenwich UCC any remaining funds would be released.

At bottom, Mrs. Conway would have an undisputed exemption in the Funds if not for Greenwich's wrongful UCC. Given the defective UCC and lien, if her counsel had been diligent and effective in pursuing the action to remove the UCC in state court, she would have been entitled to her homestead exemption and her interest in an amount that could have been determined much sooner.

The Agreement contemplated Debtors taking steps "to obtain either a voluntary termination of the Identified Risk or entry of a judgment of a court of competent jurisdiction . . . that determines that the Identified Risk is void and of no force or effect . . . ."[36] If Debtors didn't remove the UCC, Commonwealth had the right, in its sole discretion, to pay, discharge or take any other steps needed to remove the title defect including use of the entirety of the funds held under the Agreement. In the end, however, once the risk created by the UCC was removed, the Agreement confirmed the remaining Funds would be released and delivered to Debtors.

Mrs. Conway would be entitled to a $75,000 homestead exemption. But for the potential title defect created by the wrongful UCC, and the failure of her attorney to timely and effectively act to remove that cloud, the Funds would

---

[36] Secured Indemnity Agreement, Trustee's Exhibits, ECF No. 225, Ex. 8, p. 1. The draft agreement stated "UCC Financing Statement," whereas the final version changed it to "Identified Risk."

have been distributed to her at the closing. Given the need to provide assurances to Commonwealth and, more particularly, to the innocent purchaser Ms. Devilbiss, the Funds were not immediately available. The impasse with Greenwich needed resolution for the sale proceeds to be released to Mrs. Conway. The Funds have now been released.

3. The Agreement With Commonwealth Was Not Intended to Deprive Mrs. Conway of Her Homestead Exemption or Interest in the Funds.

Based on Mr. Wunsch's and Mrs. Conway's testimony, and the language of the Agreement itself, the Court finds that the parties' intent was to allow Commonwealth ready access to cash to support a potential legal defense. It was not to create a permanent deprivation of an interest in the Funds. Mr. Wunsch stated that Commonwealth supported Debtors' right to a homestead exemption in the Funds. Mrs. Conway never intended, or even contemplated, that her homestead exemption would be at risk.

Whether the Agreement affected legal title, it did not eliminate the equitable interest of Mrs. Conway to any of the Funds remaining after the resolution of the UCC issue. State law was clear that a judgment lien could not impair a homestead exemption and, at a minimum, she would have been entitled to that amount. And the Funds are no longer in the possession of Commonwealth. They are property of the estate. Mrs. Conway now has a direct interest in the Funds. This is analogous to an interest in a personal injury claim. The amount and the final confirmation of a claim may not have been known on the petition date, but once the claim has matured the debtor is

entitled to claim the exemption in an amount up to the allowable amount of the exemption.

And but for the ineffective assistance of her counsel, her exemption wouldn't be at any risk. Moreover, Wisconsin's directive that courts liberally construe exemption laws in favor of debtors guides this Court's interpretation. Consistent with that principle—and in furtherance of the equitable mandate of section 105(a) to ensure just outcomes—the Court finds Mrs. Conway is eligible to claim the exemption.

4. <u>Mrs. Conway Intends to Procure Another Homestead</u>.

Mrs. Conway's unequivocal and credible testimony was that she intended to reinvest the Funds in another homestead. She testified to her intent to buy a homestead if they had been able to use the Funds. While no efforts were made to look for a replacement at the time of the sale, the simple reason is that the Funds were being held by Commonwealth until the risk created by the improperly asserted UCC lien could be resolved. She said reinvestment in a homestead continues to be her intent.

The Trustee cites *Moore v. Krueger*, 179 Wis. 2d 449, 507 N.W.2d 155 (Wis. Ct. App. 1993), for support of his position that Debtors' claimed intent to procure a new homestead was insufficient. *Moore* involved debtors that had moved from their homestead in Rhinelander intending to sell it. The debtors didn't intend to reoccupy the house if it was sold, but suggested that they might return if it didn't sell. The court held that:

> [A] vague intent to return hinged upon the contingency that they do not sell the house is insufficient to establish the requisite intent to

24

> reoccupy the premises as a homestead. In order to fall under the
> temporary removal exception, the removal has to be made "with a
> certain and abiding intention to return to the premises and reside
> there. . . . A vague intention to return someday is insufficient."

179 Wis. 2d at 455 (citing *Schapiro v. Security Sav. & Loan Ass'n*, 149 Wis. 2d

176, 182, 441 N.W.2d 241, 244 (Wis. Ct. App. 1989).

In another case, the Wisconsin Supreme Court held that certain debtors

qualified for the homestead exemption because they did not establish a new

homestead in Iowa. *Anderson v. Anderson Tooling, Inc.*, 2021 WI App 39, 398

Wis. 2d 595, 961 N.W.2d 911. Even though that case didn't involve sale

proceeds, merely the temporary removal from a homestead with the intent to

sell, the court determined there was "nothing to contradict the proposition that

the [debtors] planned to finance the purchase of the Iowa property or finance

the construction of a new house elsewhere in [Iowa] with the proceeds from the

sale of the Wisconsin property." The court added that the debtors were renting

property in Iowa and had been in discussions with the landlord about buying

it.

The clear testimony of both Debtors was that they intended to buy

another home and would have done so at the time of the sale but for the cloud

created by the UCC filing. Until that issue was resolved, they did not have the

money to buy a new homestead, so resolving Greenwich's UCC was the first

step to finding a replacement.

Like *Moore*, Mrs. Conway's plan to someday regain and use some of the

Funds to buy a new homestead similarly rests on the contingency that

Greenwich's lien was invalid. In any event, the facts here differ from *Moore*

25

because removing the UCC was beyond Mrs. Conway's control. She entrusted Attorney Goodman with the task of removing the UCC to Commonwealth's satisfaction, which he failed to do. Not being a lawyer, Mrs. Conway was incapable of removing the UCC herself to regain control of the Funds.

Like *Anderson*, the uncontested record shows an intent to reinvest the Funds. Until the UCC was removed or satisfied and she had access to her portion of the Funds, there were no steps that Mrs. Conway could have plausibly taken to pursue a replacement residence.

Finally, it is the Trustee's burden under Rule 4003(c) to prove that Mrs. Conway is ineligible for the exemption. Nothing was presented to rebut Mrs. Conway's stated intent to use the Funds to reinvest in a homestead. And Mrs. Conway's testimony was corroborated not only by Mr. Conway, but by Debtors' current financial picture. They pay $2,100 to rent an apartment, whereas their mortgage payments on the Property were only $1,340 per month, which included principal, interest, taxes, and insurance. Renting has strained Debtors' finances, and it's more than reasonable to believe Mrs. Conway's testimony that they intend to procure a new homestead once the Funds are released to them.

## Conclusion

The Court is dismayed at the string of hardships, illegitimate claims, and regretful legal advice Debtors have faced. Debtors simply meant to protect their marital home after a disastrous scam. But they were misadvised, leaving them vulnerable and with no choice but to seek protection from this Court. And now,

through the pre-bankruptcy missteps taken by their counsel, only Mrs. Conway is eligible to claim a homestead exemption in the Funds under Wis. Stat. § 815.20.

Mr. Conway conveyed his interest in the Property to Mrs. Conway and thus didn't own the Property when it was sold. And Mrs. Conway, pushed by her lawyer to sell the Property and sign the Secured Indemnity Agreement, jeopardized her exemption. But the Court is satisfied that, despite the poor legal advice she received, the parties to the Agreement intended Mrs. Conway's homestead exemption to be protected and thus will not impede that intent.

This decision shall constitute findings of fact and conclusions of law under Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: May 9, 2025

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge