UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:

GEORGE W. CONWAY                                    Case No. 24-10126-7
and ELLEN CONWAY,

              Debtors.

## DECISION ON MOTION BY UNITED STATES TRUSTEE TO EXAMINE FEES PAID TO DEBTORS' ATTORNEY PURSUANT TO 11 U.S.C. § 329 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 2017

George W. Conway and Ellen Conway ("Debtors") filed a voluntary Chapter 7 petition on January 24, 2024. They received their discharge on June 16, 2025. Attorney Jonathan V. Goodman ("Goodman") represents the Debtors. The United States Trustee's Office ("UST") filed a Motion to Examine Fees Paid to Debtors' Attorney ("Motion") on September 10, 2025. Goodman responded.

The questions before the Court are: (1) whether the fees paid to Goodman are reasonable or excessive; and (2) whether fees paid to Goodman are subject to disgorgement and, if so, to whom should the fees be paid.

The Motion is granted. Attorney Goodman must disgorge the $30,000 post-petition fees he was paid. Such fees shall be paid to the Chapter 7 Trustee as property of the estate and will not be refunded to the Debtors.

### STATEMENT OF FACTS

Pre-Petition Services

The Greenwich Business Capital, LLC ("Greenwich") case began in May 2023 in Rhode Island Superior Court.[1] The court entered judgment for Greenwich in July 2023. Mr. Conway and Muldoon Dairy, Inc., were jointly and severally liable for $248,272.77 ("Judgment").[2]

In August 2023, Greenwich filed a UCC Financing Statement ("UCC") with the Dane County Register of Deeds. It attached a copy of the Judgment. Greenwich incorrectly expected that this filing perfected its foreign judgment and would result in payment of the Judgment from a sale of Debtors' real property ("Property").[3] The expected payment did not materialize.

The UCC created a potential cloud on title. To close, the title company required retention of the net sale proceeds until that issue was resolved. So, $227,385.17 in net proceeds was held by Commonwealth Land Title Insurance Company ("Commonwealth").

Goodman provided legal services related to the Property both before and after entry of the Judgment. He prepared a Quit Claim Deed in March 2023 transferring the interest of George Conway to his wife as her sole property. This was allegedly an effort to shield the Property from any claim of Greenwich.

---

[1] *See* Complaint by Greenwich Business Capital, LLC Objecting to Debtor's Discharge and for Other Relief, Adv. Case No. 24-25, Dkt. No. 1 at ¶ 15.

[2] *Id.* at ¶ 16.

[3] *Id.* at ¶¶ 21-24.

In June 2023, Goodman responded to the UCC with a declaratory judgment action in Dane County Circuit Court. The action challenged the UCC filed by Greenwich. But Goodman failed to obtain proof of service of the Summons and Complaint. Yet he filed for a default judgment without any proof of service.

The state court denied his motion. It dismissed the action. Goodman complains that the denial of the motion and dismissal of the action was not his fault. Instead, he says the attorney who appeared for Greenwich at the hearing bore all the responsibility because Greenwich had actually been served, and that attorney should have told the court service had occurred and Greenwich had not filed a timely answer.

This was followed by Goodman's representation of Mr. Conway in at least two actions[4] arising out of the Judgment. These actions began in Dane County Circuit Court in November and December 2023.[5]

On November 17, 2023, Greenwich finally filed the Judgment with the Clerk of the Dane County Circuit Court. It was docketed as a foreign judgment. In December, Greenwich began steps to enforce the Judgment through post-judgment proceedings. In January 2024, a non-earnings garnishment action

---

[4] *Greenwich Business Capital, LLC v. George M. Conway, et al.*, Case No. 2023CV003203; *Greenwich Business Capital, LLC v. Muldoon Dairy, Inc., et al.*, Case No. 2023FJ000039.

[5] Case No. 2023CV003203 began December 6 and was dismissed September 6, 2024. Case No. 2023FJ000039 began November 17 and received administrative disposition on July 29, 2024 (the judgment was satisfied due to bankruptcy).

directed at Commonwealth and a motion for turnover were started by Greenwich.

These actions brought the matter to a head. A billing statement prepared by Goodman indicates he began preparing for Debtors' bankruptcy on January 3, 2024.[6] Goodman prepared a Legal Representation Agreement dated January 5, 2024 ("Agreement") related to the bankruptcy and sent it to the Debtors. They added the amount of retainer paid, signed the Agreement, and returned it to Goodman. He did not sign it but neither did he tell the Debtors he didn't agree to the terms in the Agreement. The Debtors filed a Chapter 7 on January 24, 2024.

Disclosures and Examination of Fees

Goodman filed a Disclosure of Compensation. It said he agreed to accept $10,000 for services in the bankruptcy, he received $386 before the filing, and the balance of $9,614 was due. In return for that amount, Goodman promised:[7]

> 5. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:
>
>    a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
>
>    b. Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;

---

[6] Dkt. No. 284-15 at 3.

[7] Dkt. No. 22-10 at 2, ¶ 5.

    c.   Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

    d.   Representation of the debtor in adversary proceedings and other contested bankruptcy matters;

    e.   [Other provisions as needed] Debtor has agreed to pay $400/hour, plus costs. Attorney received $10,000 on 5/19/23 which was used to pay for ongoing litigation.

This disclosure comports with the Statement of Financial Affairs filed on February 9, 2024. It says $10,000 was paid in May 2023 to Goodman. It seems the reference to "ongoing litigation" relates to a breach of contract action[8] commenced by Greenwich against Mr. Conway and his company, Muldoon Dairy, Inc.

No supplement or amended Form 2030 has been filed. No pre-petition fees owed to Goodman are on any schedules or amended schedules despite the fact that he now says he is owed for pre-petition services.

Responding to the request of the UST for a copy of a retainer agreement, Goodman provided the pre-petition Agreement.[9] It was signed by the Debtors. It stated that $10,386.42 had been paid to him in connection with the bankruptcy. The Agreement was for continuing services representing the Debtors in their Chapter 7 proceedings.[10] It also referenced fees at a rate of $400 per hour.[11]

---

[8] *Greenwich Business Capital, LLC, formerly known as Ponte Investments, LLC v. Muldoon Dairy, Inc. et al.*, Rhode Island Case No. KC-2023-0330.

[9] Dkt. No. 284-1.

[10] *Id.*, ¶ 1.2, 1.3.

[11] *Id.*, ¶ 2.1.

Goodman admits he never signed the Agreement. He verified it was the only retainer agreement.[12]

Debtors were never told Goodman didn't agree to the terms in the Agreement. When asked for a copy of the retainer agreement, this is the only Agreement he produced.

Renewed requests were made by the UST for any other retainer agreements and for statements of costs and fees. Goodman provided a statement that listed $52,980.00 in fees and $1,200 in costs ("2025 Statement"). It reflected payments totaling $13,038.[13]

The detail was simply a date and brief description of services ranging from March 15, 2023, through May 12, 2025. Eventually Goodman said he had received $30,000 from the Debtors post-petition.[14]

The actual post-petition payments to Goodman were:

- March 5, 2024                                        $    150.00
- 2025 (no specific date provided)                     $    500.00
- 2025 (no specific date provided)                     $  2,200.00
- July 3, 2025                                         $30,000.00
- TOTAL Post-Petition Payments                         $32,850.00

In response to discovery requests by the UST, a second post-petition retainer agreement was produced. It is dated August 26, 2025 ("2025

---

[12] Dkt. No. 251 at 5, ¶ 17, and No. 252-2 at 2.

[13] Dkt. No. 284-15 at 1.

[14] Dkt. No. 252-4.

Agreement").  It addresses representation from that date in connection with the bankruptcy. It provides for charges at an hourly rate.

The reason for the second retainer agreement was explained by Goodman and in the Agreement:[15]

### 6. PRIOR RETAINER.

Prior to the filing of the Bankruptcy Petition, the Clients have executed a previous Retainer Agreement. The U.S. Trustee claims that the prior Agreement is null and void and the Clients wish to execute this Agreement to confirm their obligations to Attorney who, they acknowledge, has worked for them above and beyond the call of duty, including continuing to represent them without a retainer with no guarantee of any payment. Clients acknowledge responsibility, for all prior legal work done by the Attorney both pre- and post-petition filing and acknowledge that their debt to Attorney Goodman is reaffirmed notwithstanding the discharge he was successful in obtaining for them in their Chapter 7 proceedings. They acknowledge that they will remain responsible to the Attorney for all his costs and expenses, regardless of whether the court orders him to return payment we made to him earlier this year of $30,000.00.

While the above may explain what the Debtors understood, it is untrue. The UST did not claim the January 2024 Agreement was null and void. It simply asked for a copy of any retainer agreement and then that the Court examine Goodman's fees.

The "Prior Retainer" provision added to the 2025 Agreement[16] reflects that Goodman received a post-petition payment of $30,000 earlier in the year.

---

[15] Dkt. No. 284-21 at 3, ¶ 6.

[16] "Prior Retainer" refers to a pre-petition Legal Representation Agreement dated January 5, 2024. Debtors signed the Agreement. Goodman did not sign it. The Agreement says the Debtors deposited a retainer of $10,386.42. Dkt. No. 284-1 at ¶ 2.1.

The provision does not provide a payment date. A wire transfer, however, indicates Mrs. Conway wired $30,000 to Goodman on July 3, 2025.[17]

There is no indication of the payment in the 2025 Statement. Neither does it appear to be reflected in the 2026 Statement prepared and filed by Goodman in February 2026.

The changes in the 2025 Agreement go far beyond restating the agreement prepared by Goodman and signed by his clients. The 2025 Agreement seeks to reaffirm <u>all</u> pre- and post-petition costs and fees without the filing of any reaffirmation agreement. While being owed amounts pre-petition in a Chapter 7 does not disqualify an attorney from representing debtors, it should be disclosed. It was not.

The additional charges are also inconsistent with the understanding of Mrs. Conway as of March 14, 2025. At that time, she testified:

> ATTORNEY RODRIGUEZ: So, since you filed bankruptcy in January of 2024, have you and your spouse any--occ--incurred any new expenses, any new debts, anything of that nature?
>
> ELLEN CONWAY: No.
>
> ATTORNEY RODRIGUEZ: What about any additional attorney's fees? Have you been told you owe any additional attorney's fees?
>
> ELLEN CONWAY: God bless him, no.

Dkt. No. 252 at 3.

In February 2026, at the hearing on the UST's Motion, Mrs. Conway testified she does not want the $30,000 wired to Goodman returned to her. The

---

[17] Dkt. No. 284-18.

money was part of the funds she received from the sale of her prior homestead. Those funds were part of a homestead exemption that she testified she intended to reinvest in a new residence. Having paid the money to Goodman, she did not invest it in a replacement home. This confirms the funds will not be used within the statutory time to reinvest in a replacement home. There is no ability or intention to reinvest the funds in a homestead.

Goodman prepared and filed another Summary of Time of Jonathan V. Goodman ("2026 Statement") on February 12, 2026. The 2026 Statement was prepared for the final hearing on the Motion. According to the 2026 Statement, the total amount due is $69,607.53. The 2026 Statement does not contain the credits previously listed in the 2025 Statement. Unlike the prior statement, the 2026 Statement adds $4,000 in travel costs and almost two more years of pre-petition services and approximately four months of additional post-petition time.

Post-Petition Services

In April 2024, Greenwich filed an adversary proceeding against the Debtors. Greenwich's Complaint was premised on the claim that the loans from Greenwich to Mr. Conway's business and guaranteed by him were nondischargeable under various provisions of 11 U.S.C. § 523. The facts pled the potential of a fraudulent transfer based on the Quit Claim Deed between the Debtors.

9

Goodman filed an Answer to the nondischargeability adversary. He challenged any right to pursue Mrs. Conway and denied that Mr. Conway "performed with regard to any obligations" to Greenwich.

The Answer did contain what was labeled a Counterclaim referencing pre-petition demands to terminate both the May 15, 2023, and the August 8, 2023, UCC filings. It did not, however, make any reference to release of the November 2023 filing and perfection of the foreign judgment with the Dane County Clerk of Circuit Court.  That counterclaim was dismissed on July 8, 2024.

Goodman did not object to the Greenwich proof of claim. He did not file an action for lien avoidance. Discovery requests were made in the nondischargeability adversary and agreements reached to extend time to respond.

The Chapter 7 Trustee ("Trustee") retained counsel to pursue a number of turnover actions. The Trustee pursued the turnover of an investment account of Mrs. Conway at Compushare USA that had not been included in the original schedules. Similarly, the Trustee pursued the turnover of property held in an account at Charles Schwab & Co. Inc. (Adv. Case Nos. 24-00032 and 24-00033).

And the Trustee pursued avoidance of the Greenwich UCC and perfection of a foreign judgment. After obtaining orders denying Greenwich's motions to abstain or dismiss and enforcing the automatic stay, the Trustee sought discovery of Greenwich including depositions.

Since there were also requests for depositions by Goodman in the Greenwich adversary, Goodman indicated he would coordinate dates with the attorneys for Greenwich.

Despite the transfer of Mr. Conway's interest in the Property to Mrs. Conway as "sole owner of the Property,"[18] Goodman claimed homestead exemptions for both Debtors using the Wisconsin exemption. So in a companion contested matter, the Trustee filed an objection to the Debtors' claim of exemptions. At the preliminary hearings, the parties stated time was needed for discovery.

Rather than coordinating discovery, Goodman filed a motion to approve a settlement with Greenwich.[19] The settlement agreement would:

- Pay $75,000 of the Property sale proceeds to Greenwich

- The balance of the funds at Commonwealth to Debtors

- Convert the case to a Chapter 13

- Classify the claim of Greenwich as secured

- Prohibit adverse actions against Greenwich

- Resolve litigation among Greenwich, Debtors, and third parties in state court.[20]

---

[18] Dkt. No. 225-2.

[19] Dkt. No. 149.

[20] Dkt. No. 149-1.

11

At the same time, Goodman filed a motion to convert the case to a Chapter 13.[21]

In January 2024, the Court determined that Greenwich was an unsecured creditor. An Order for Judgment and Judgment was entered granting the motion of the Trustee determining that Greenwich held no valid or perfected lien, its lien was void, and it was simply a general unsecured creditor.[22]

Approval of the settlement agreement was denied in January 2025.[23] Less than a month later, the Greenwich nondischargeability adversary was dismissed.[24]

The Court held concurrent evidentiary hearings on Trustee Hart's objection to exemptions and the Debtors' motion to convert. The Court denied Mr. Conway's homestead exemption but allowed a homestead exemption for Mrs. Conway. The Court found she resided in the property as her homestead at the time of the sale. She testified it was her intention to reinvest the proceeds from the sale in a new residence.

It was the delay, failure to file proof of service, and ineffectual actions by Attorney Goodman in the state court action to clear that potential cloud that impeded her ability to control and reinvest the funds in a new home.

---

[21] Dkt. No. 144.

[22] Adv. Case No. 24-00034, Dkt. No. 42.

[23] Dkt. No. 199.

[24] Adv. Case No. 24-00025, Dkt. No. 35.

Mrs. Conway sold the property on September 5, 2023. Still, a window to reinvest the Funds in a replacement homestead existed.[25] More than two years have passed since the sale. The proceeds have not been reinvested in a residence. She took $30,000 of the proceeds she received and paid it to Goodman. This confirms that her intent to reinvest that part of the proceeds no longer exists.

The Request to Examine Fees

The UST asks this Court to examine Goodman's pre-petition and post-petition fees under Rule 2017. The UST says any pre-petition legal fees are dischargeable in Chapter 7 cases. Based on the 2026 Statement, it appears the unpaid pre-petition costs and fees may be $5,445.[26] Goodman produced the 2026 Statement to include the time detail for post-petition services.[27] According to that document, his post-petition fees total $51,920.00.

The UST asserts the Court should order Goodman to return any excessive fees or fees received post-petition under section 329(b). According to the UST, the pre-petition payment that is or would be property of the estate totals $436.42, and the post-petition amounts that are or would be property of the estate total $30,000.00. This does not include the $500.00 payment made sometime on or before May 9, 2025.

---

[25] Dkt. No. 232 at 17.

[26] Dkt. No. 286-2. Adding the amount stated as pre-petition fees ($15,040) and costs ($405) would leave $5,445 owed for pre-petition services after credit of $10,000.

[27] Dkt. No. 286-2 at 18-21.

13

Goodman objects, arguing that he is entitled to the fees. Goodman maintains that Debtors have voluntarily paid him, regardless of their discharge. He believes he deserves to keep all amounts paid and to remain able to collect any pre- or post-petition unpaid fees and costs. With Goodman's help, he says the Debtors:

- Sold their home;

- Tried to use the proceeds to purchase a replacement;

- Tried to turn any remaining proceeds into other exempt assets;

- Tried to settle with Greenwich; and

- Agreed to use any remaining funds from the sale to pay Goodman.[28]

The goal they sought was not achieved. He blames the Providence County Sheriff, Greenwich, and Greenwich's attorney for the inability to accomplish their goals.[29]

Goodman acknowledges receipt of the signed Agreement. And, he says, he continued to represent the Debtors even though he didn't have a retainer.[30]

Another reason he says he should be able to keep all the amounts paid to him and to continue to collect from the Debtors for any unpaid amounts is a comparison of the fees and costs received by the attorney for the Trustee.

---

[28] Dkt. No. 293 at 1-2, ¶ 5.

[29] *Id.* at 2, ¶ 6.

[30] *Id.* at 2, ¶ 10.

No objection was filed by Goodman to the employment of the Trustee's attorney. A portion of the services were to be provided on a contingent fee basis. That related to litigation with Greenwich and determination of its secured status.[31]

The result of that action was a determination Greenwich was unsecured. So, the $227,385.17 held by Commonwealth, subject to a homestead exemption of $75,000 for Mrs. Conway, was property of the estate. This generated compensation to the Trustee's attorney of $50,761.48. The Order approving compensation to the Trustee's attorney confirmed that the fees were reduced based on an agreement the fee would be a one-third contingent fee based on the net recovery.[32] Other services were billed hourly.

The relevance? Goodman says he contacted the Trustee and the Trustee's attorney "offering assistance free-of-charge in eradicating Greenwich's claims."[33] Yet, Goodman also says it is "a no brainer" that a UCC-1 based on a judgment doesn't create a lien and that within 90 days of the proper domestication of the Greenwich Judgment there was a bankruptcy. As a result, action could be taken to eliminate it.[34]

This argument is flawed in a number of ways. First, the compensation allowed for the attorney for the Trustee was subject to notice and hearing. The Court considered the objection of Goodman and denied it. Second, if action to

---

[31] *Id.* at p. 3, ¶ 18.

[32] Dkt. No. 242 at 1 and Dkt. No. 250.

[33] Dkt. No. 245 at 2, ¶ 3.

[34] *Id.* ¶ 6.

15

eliminate the lien of the domesticated judgment was simple, then Goodman could have had it removed. He failed to do so.

Finally, when the opportunity presented itself in the nondischargeability adversary, Goodman negotiated a deal with Greenwich that would have permitted it to receive and retain $75,000. The balance of those sale proceeds—$152,385.17—would have been paid to the Debtors. The agreement also provided for conversion to Chapter 13. But whether any monthly disposable income would have been available to fund a plan was unclear based on the income and expenses of Debtors. This was one of the considerations as part of the denial of the motion to convert.

<strong>DISCUSSION</strong>

## I.   Jurisdiction

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157. The matter before the Court is payment and reasonableness of attorney's fees. So this is a core proceeding under section 157(b)(2)(A). The Court may enter final judgment. 28 U.S.C. § 157(b)(1).

## II.   Legal Standards

### A.   11 U.S.C. § 329(a) and Fed. R. Bankr. P. 2016

Section 329 governs a debtor's transactions with his attorney. Section 329(a) states:

> **(a)** Any attorney representing a debtor . . . shall file with the court a statement of the compensation paid or agreed to be paid, if such payment . . . was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

Section 329(a) implements Rule 2016. Rule 2016(b)(2) requires that "[w]ithin 14 days after any payment . . . not previously disclosed, [a debtor's] attorney must file and send to the United States trustee a supplemental statement." Fed. R. Bankr. P. 2016(b)(2).

Failure to disclose is a serious omission. "'Coy or incomplete disclosures' that force the court 'to ferret out pertinent information' will not do." *In re Gilliam,* 582 B.R. 459, 473 (Bankr. N.D. Ill. 2018) (quoting *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991)). Disclosure failures are sufficient grounds to deny compensation. *Id.* at 467. An attorney has no absolute right to an award of compensation. *In re Sandpoint Cattle Co., LLC*, 556 B.R. 408, 418 (Bankr. D. Neb. 2016). "[C]ourts have broad and inherent authority to deny any and all compensation where an attorney fails to satisfy the requirements of the Code and Rules." *Id.* at 420. The provisions that regulate attorney fees are designed to protect both the debtor and creditors against overreaching attorneys. This includes the broad power, discretion, and duty to examine fees for reasonableness.

B.  <u>Wisconsin Supreme Court Rule 20:1.5</u>

Wisconsin Supreme Court Rule 20:1.5(b) requires that the scope of representation and the basis or rate of the fees must be communicated to the client. In addition, if it is reasonably foreseeable the costs will be more than $1,000, that must "be communicated in writing." SCR 20:1.5(b)(2). And the

17

communication must be "before or within a reasonable time after commencing the representation . . . ." SCR 20:1.5(b)(1).

### III.    Failure to Comply With 11 U.S.C. § 329(a) and Rule 2016

Goodman has failed to follow the requirements of section 329(a) and Rule 2016(b). The initial disclosure said the agreed compensation was $10,000 (including the filing fee) with $9,614 owed post-petition.[35] It also referred to an hourly rate of $400 plus costs. No exclusions from services to be provided were disclosed. The Statement of Financial Affairs disclosed a payment of $10,000 in May 2023. The schedules failed to disclose that there were outstanding pre-petition fees and costs owed to Goodman.

It is also unclear what Debtors have paid Goodman. Goodman is not transparent about the payments Debtors made to him. The 2025 Statement shows two credits of $500 and $2,200. Goodman does not provide the source of compensation or the exact dates. Instead, the 2025 Statement simply indicates the payments were received post-petition. The $500 and $2,200 payments were never included in a disclosure of compensation.

Goodman simply credits payments against the total 2025 Statement amount. Being received post-petition, the Court must *infer* which legal service relates to each credit. As to post-petition payments, the Court will find they must be applied to any reasonable post-petition services.

---

[35] Dkt. No. 22-10 at 1.

The $2,700 in credits are disclosed on the 2025 Statement. The 2026

Statement omits any reference to these payments. There is no explanation for

this omission of credits for those payments.

Both statements exclude the $30,000 payment Goodman received post-

petition for costs, reimbursements, and fees. Mrs. Conway received a $75,000

check from the Chapter 7 Trustee on June 19, 2025, representing her

homestead exemption. Debtors then made the $30,000 payment to Goodman.

Goodman never filed a supplemental disclosure statement. The UST

confirms that "[n]o supplemental or amended Form 2030 has ever been filed."[36]

And it is well beyond the 14 days Rule 2016(b) affords Goodman to file a

supplemental disclosure for any payment not previously disclosed. The

additional payments only came to light because of the persistence of the UST in

pursuing documents, information, and details from Goodman. Getting a clear,

consistent set of facts about terms of agreements, amount of fees, and amounts

paid to Goodman is like trying to nail Jello to a wall. There are sufficient

grounds to deny compensation on the disclosure failures alone.

A. <u>11 U.S.C. § 329(b) and Fed. R. Bankr. P. 2017</u>

Section 329(b) provides:

> **(b)** If such compensation exceeds the reasonable value of any
> such services, the court may cancel any such agreement, or order
> the return of any such payment, to the extent excessive, to—
>
> > **(1)** the estate, if the property transferred—

---

[36] Dkt. No. 251 at ¶ 13.

**(A)** would have been property of the estate; or

. . .

**(2)** the entity that made such payment.

11 U.S.C. § 329.

Rule 2017 bolsters section 329(b). Rule 2017(a) provides for the examination of payments by a debtor to an attorney before the entry of the order for relief. It includes any payment whether direct or indirect. The payment must have been in contemplation of the commencement of a bankruptcy case. 9 COLLIER ON BANKRUPTCY ¶ 2017.02. Under Rule 2017(b), a court may review a payment (or an agreement to make a payment) to an attorney by the debtor after the entry of an order for relief in a bankruptcy case. A court may find that the payment is excessive considering the services performed or to be performed. *Id.* The examination is determined on a case-by-case basis. *Id.* at ¶ 2017.11.

"Agreed upon compensation of a debtor's attorney may be excessive for a variety of reasons, including the size of the fee, counsel's failure to disclose the compensation as required by § 329(a), or conduct by the attorney that diminishes the value of the legal services." *In re Wood*, 408 B.R. 841, 848 (Bankr. D. Kan. 2009). In determining the reasonable compensation of services rendered, courts will apply the tests used in reviewing an application for compensation under section 330. 9 COLLIER ON BANKRUPTCY ¶ 2017.05. The factors under section 330(a)(3) are:

**(A)** the time spent on such services;

**(B)** the rates charged for such services;

**(C)** whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

**(D)** whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

**(E)** with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

**(F)** whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A)-(F).

"Once a question of the reasonableness of counsel's fees is raised by a party in interest bringing a motion, the attorney bears the burden of proving his fee was reasonable." *Wood*, 408 B.R. at 848. "Part and parcel of this burden is the responsibility to include sufficient detail in the application to enable the Court to make an informed judgment about the reasonableness of the fees sought and the necessity and benefit of the work performed." *In re Harry Viner, Inc.*, 520 B.R. 268, 275 (Bankr. W.D. Wis. 2014). Goodman has failed to carry his burden.

### *1.* Post-Petition Services

The 2026 Statement claims that Goodman's post-petition fees amount to $54,567.53. It suggests Goodman provided extensive post-petition legal services for the Debtors. The issue, however, is the reasonable compensation for the services rendered. Another consideration is whether the services were beneficial toward the completion of the case or furthered the administration of the case. Goodman's fees for post-petition services are not reasonable. They are excessive for several reasons. Goodman's services delayed and increased the costs of administration and completion of the case.

First, Goodman did not timely disclose the $30,000 he received from Debtors. Goodman's acceptance of the $30,000 payment, post-petition and without disclosure, raises questions about self-interest. He also represented to the Debtors that a "new" retainer agreement was required because the pre-petition agreement was void and unenforceable according to the UST. That representation was false. He drafted an agreement that says regardless of their discharge and despite any Court order, they remain liable for all pre- and post-petition costs and fees. There is no evidence that he told them any unpaid pre-petition fees and costs were potentially dischargeable. He permitted them to sign the Agreement believing it represented an actual agreement and never told them he didn't agree to its terms.

22

Goodman argues that he was paid voluntarily, although Debtors were discharged from payment of pre-petition fees.[37] Yet, Goodman's failure to disclose coupled with the 2025 Agreement and the apparent willingness of the Debtors to pay him leads to the conclusion that—at least in his opinion and the impression created for his clients—pre-petition debt is not discharged and collectible during and after a bankruptcy case.

Second, Goodman appears to have created a conflict of interest with the Debtors. A Seventh Circuit opinion notes that "[t]he existence of a conflict of interest is certainly a relevant factor in [a section 330] analysis and is a justifiable reason to reduce or require disgorgement of attorneys' fees, but reduction or disgorgement is not mandatory." *In re Wiredyne, Inc.*, 3 F.3d 1125, 1128 (7th Cir. 1993). One bankruptcy court found that an attorney who accepted post-dated checks from debtors for services rendered pre-petition and failed to advise the debtors that their pre-petition fees were at least potentially dischargeable created a conflict of interest under Tennessee's Rules of Professional Conduct. *In re Waldo,* 417 B.R. 854, 887 (Bankr. E.D. Tenn. 2009).

Third, the quality of legal services leaves little doubt about whether the services were beneficial. Pursuant to section 329(b), the quality of legal services is a factor when assessing whether compensation is reasonable. *Willoughby v. Peterson,* No. 15 C 6719, 2016 WL 890755, at *3 (N.D. Ill. Mar. 9, 2016). The

---

[37] Dkt. No. 253 at ¶ 5.

Ninth Circuit has affirmed a bankruptcy court's disgorgement of an attorney's fees it found unreasonable when the only service the attorney provided to a debtor "was the completion of the bankruptcy petition that was incomplete and erroneous and that required extensive amendments." *Hale v. U.S. Tr.,* 509 F.3d 1139, 1147 (9th Cir. 2007).

Goodman's filings alone show a pattern of substandard legal services. He testified he has been in practice for more than 50 years. He estimated he has filed more than 50 debtor bankruptcies. Through the years, Goodman says he filed many Chapter 11 cases between 2008 and 2019. Following 2019, he "started over" and took on more cases that were not Chapter 11 cases. This experience suggests a level of practice not demonstrated in this case.

The record reflects that the Clerk's Office notified Goodman of filing deficiencies on multiple occasions. Goodman filed the petition four times. He failed to file signed forms. And he failed to file proofs of service. The Clerk's Office called Goodman's assistant about the multiple clerk notifications. The Court ordered Goodman to show cause why he failed to follow procedures in this District.[38]

In fact, his services were root causes of litigation that could have been avoided. In particular:

- If he had not advised Mr. Conway to quitclaim his interest so that the residence was the "sole property" of Mrs. Conway, the objections to

---

[38] Dkt. No. 30.

the homestead exemptions would have been eliminated or significantly reduced.

- o Under state law, each debtor would have been entitled to claim a homestead exemption of $75,000.

- o The Greenwich UCC (and foreign judgment) filings impaired the homestead exemptions of both Debtors and to the extent of that impairment would have been avoidable.

- o Goodman's actions cost George Conway a $75,000 homestead exemption.

- o His actions increased the costs and fees incurred by the estate.

- If Goodman had been diligent, he would have followed up to obtain a certificate of service in the Dane County action against Greenwich. He would not have filed a motion for default judgment without complying with the Rules of Civil Procedure to prove that the complaint had been served. His pre-petition bills include time for these valueless services.

- If Goodman sought to benefit his clients or advance the administration of the case, he would have taken care in the preparation of the petition, schedules, and statement of Social Security number.

- o He filed unsigned pleadings and did not timely correct those mistakes.

25

- o Schedules were amended six times and still were inaccurate or incomplete.
- o The docket entries disclosed that Mr. Conway filed a Chapter 7 in 2005. Following the link would have led to a complete set of schedules in that case that included assets not in the schedules Goodman prepared. When the information was disclosed by the Debtors to the Trustee, Goodman failed to follow-up to fully amend the schedules. Instead, the Trustee gathered the information and pursued recovery of the assets.

- Advancing the administration and closure of the case was ill-served by the actions of Goodman professing to cooperate with the Trustee to schedule discovery of Greenwich but then asking for approval of a settlement with Greenwich instead.
  - o Goodman maintained that Greenwich was not secured, yet he took no action to challenge its proof of claim or its argument it was secured.
  - o In an about-face, he negotiated a settlement that would have given Greenwich $75,000 as a secured claim and waived any challenge to secured status. Although this would have benefited the Debtors because it was one avenue to closing the nondischargeability adversary Greenwich brought, the result would have preferred one unsecured creditor over all others.

26

    o   Then he argues he could have challenged Greenwich at less cost

than the estate incurred.

Fourth, the contrast between the 2025 Statement and the 2026

Statement raises the issue of whether Goodman's activities were adequately

documented from the start of his representation. Without accurate statements,

the Trustee and the Court cannot determine the reasonableness of Goodman's

fees. The 2025 Statement does not provide the time spent or rates charged for

*each* service. It gives vague entries such as "[r]esearch"[39] and "[t]rial

preparation."[40]

The 2026 Statement provides time increments. It lists the hourly charge

and more detailed entries. A $400 per hour rate is within the customary rate

for consumer debtor attorneys in this District. It also adds time and tasks not

previously identified on any statement.

Still, the inconsistencies between the statements are but one cause for

concern. Goodman's explanation is simply that the first statement was just for

the Trustee and not for the Court. The UST requested time and billing records.

As an experienced attorney, Goodman knew—or should have known—that his

duty was to provide accurate responses.

If the question was time spent, an experienced attorney such as

Goodman knows that detail matters. Time increments are part of detail in

bankruptcy. The addition of time, detail, and other charges to the 2026

---

[39] Dkt. No. 252-5 at 5.

[40] *Id.* at 6.

Statement for any services related to the bankruptcy raises the specter that neither statement might be accurate. The initial inadequacy of Goodman's documentation warrants scrutiny.

The total fees beginning with pre-petition time that can be identified as spent in preparation for filing a bankruptcy and then the post-petition time far exceed the usual or customary fees in a Chapter 7 case. Often the fees in this District are $2,000 or less. At times, the fees exceed that amount because of adversary proceedings or contested matters. But not because of ill-advised actions based on the lawyer's advice.

Fifth, while the Debtors received a discharge, the fees should not have exceeded the typical fees in this District. The time detail provided by Goodman demonstrates failed services, lack of attention to detail, mistakes in preparation of documents, and duplication of time. Specifically, Goodman filed numerous amendments to schedules and still failed to include certain assets. Further, Goodman's failures to follow the Code, Rules, and Local Rules culminated in the need for an Order to Show Cause on February 21, 2024. His advice that George Conway quitclaim his interest in a residence to his wife led directly to the objection to the homestead exemption he claimed but also to the loss of $75,000 in exemptions. But for the quitclaim, Mr. Conway would have been entitled to a homestead exemption under the same reasoning that led to an exemption for Mrs. Conway.

Goodman also failed to file an objection to the application to employ or the terms of employment for the attorney for the Trustee. Then, after the

28

Trustee's attorney successfully challenged the secured status of Greenwich, Goodman objected to the compensation. He argued that he filed an action in Circuit Court and didn't hear from the Sheriff, so he went ahead and filed a default judgment motion. Still, he says he offered to pursue the issue of Greenwich's status and its claimed lien "free of charge." These actions had no benefit for his client.

Sixth, it is questionable whether the Debtors' estate derived any benefit from Goodman's representation. "Fees are properly payable out of estate assets when a commensurate benefit to the estate is provided." *In re NTG Indus., Inc.*, No. 88 B 01635, 1991 WL 17786, at *4 (Bankr. N.D. Ill. Jan. 30, 1991). Goodman filed various motions and objections that increased the costs and time of not only the Debtors but also of the Trustee. It came at the cost to creditors who may have received a greater and more swift distribution. Further, it increased the time spent by the Court and Clerk's Office staff.

Certain motions—including a motion to convert in which Debtors failed to demonstrate good faith[41]—that Goodman filed did not benefit either the Debtors or the estate. Other motions appear to exceed what was reasonably necessary. For instance, Goodman moved in limine relating to the Debtors' homestead exemption, which was meritless.[42] The motion was denied.

Of equal weight is that bad advice and failure to follow the simplest of the Wisconsin Rules of Civil Procedure when pursuing a default judgment

---

[41] Dkt. No. 231 at 9.

[42] Dkt. No. 226.

increased the fees he now seeks from Debtors. The Quit Claim Deed Goodman drafted and had George Conway sign was aimed at hindering or delaying collection actions by Greenwich. The consequence, however, was the loss of a homestead exemption for Mr. Conway—a cost to him of $75,000. Then he expended significant time litigating the homestead exemption, increasing not only what he now tries to have Debtor pay him but also the costs and expenses for the estate.

The Court recognizes the quantity of hours in the Billing Statements for services created by Goodman. But it is the quality of those services that matters. Many of Goodman's efforts led to ineffective results. They created time, expense, and problems that could have been avoided. The Court concludes that not all of Goodman's services produced a demonstrable benefit to the estate or benefit to his clients. The benefit to Debtors was of no more benefit than that a discharge was eventually received. No demonstrable benefit was provided to the estate.

### *2.* **Pre-Petition Services**

Goodman's fees for pre-petition services total $15,040 according to the 2026 Statement. Of that amount, $3,360 appears to be for services unrelated to the facts of this case (services rendered 2021-2022). At any rate, the fees are excessive because aspects of Goodman's pre-petition services did not benefit his clients and led to increased costs and fees for them.

Goodman's services related to the Property cast serious doubt on his competency. As this Court noted in its decision regarding the Debtors'

30

homestead exemption, Goodman made a "feeble attempt" to clear Greenwich's pre-petition cloud on title.[43] This attempt was filing a slander of title action in state court which "was ineffective because of a lack of proof of service."[44] The Court explained that "[t]hese missteps resulted in a dismissal without prejudice of that action."[45] Goodman takes no responsibility for dismissal of that action. Instead, he blames the Rhode Island Sheriff for not sending the proof of service to him instead of his clients and to the Greenwich lawyer for failing to tell the state court his client had been served and they didn't timely answer. In other words, someone else was supposed to take the actions a diligent lawyer would have taken in representing their client.

Mrs. Conway entrusted Goodman to remove the UCC filed by Greenwich. Goodman did not remove it. His failure resulted in Mrs. Conway being unable to pursue a possibility of buying a new residence with escrowed funds from the sale of the real estate. Commonwealth held the funds, waiting for the risk of Greenwich's UCC lien to be resolved.[46]

Goodman also gave advice that was detrimental to the Debtors' interest. Mr. Conway quitclaimed his interest in the Property to Mrs. Conway. Mr. Conway anticipated litigation from Greenwich due to defaulting on his loans with Greenwich. On Goodman's advice, Mr. Conway believed that quitclaiming his interest would protect the Property and Mrs. Conway from possible liability

---

[43] Dkt. No. 232 at 18.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 25.

to Greenwich. Mr. Conway also believed, on Goodman's advice, he would retain an interest in the real property regardless of the quitclaim.[47]

Goodman's misstep did not benefit the Debtors. But for Goodman's legal services, Debtors would not have lost a homestead exemption and an opportunity to buy a replacement residence. Goodman's "regretful legal advice," as noted by this Court, resulted in Mr. Conway losing his $75,000 homestead exemption. The Court ruled that only Mrs. Conway was eligible to claim a homestead exemption.[48] The Court concluded that Debtors "were misadvised, leaving them vulnerable and with no choice but to seek protection from this Court."[49]

## IV.   Failure to Comply With SCR 20:1.5

If it is reasonably foreseeable that costs will be more than $1,000, that must "be communicated in writing." SCR 20:1.5(b)(2). There is no question Goodman and his clients anticipated the costs (meaning fees) would be more than $1,000. The Debtors inserted $10,385 in the retainer agreement Goodman drafted. He used that same number in his initial disclosures. His fee statements also reflect amounts in excess of $1,000 for pre-petition services.

The only written agreement for services for the bankruptcy is the Agreement he produced. By producing this for the UST, he represented it was the written agreement with Debtors. He didn't tell the UST or the Court until

---

[47] *Id.* at 3.

[48] *Id.* at 26-27.

[49] Dkt. No. 232 at 26.

32

the final hearing on the Motion that he didn't sign it because it was not accurate. This suggests, at the least, that he had not agreed to its terms.

Goodman didn't return the Agreement to his clients unsigned. He didn't tell them it was not accurate. He did not tell them the amount was wrong. Goodman didn't tell them he disagreed with its terms. He simply says he didn't sign the Agreement.

It seems his view then changed. He told his clients a new agreement was needed. He drafted the 2025 Agreement, but only after there was a motion to examine his fees.

One of two things is true. Either the 2024 Agreement was the written agreement between the Debtors and Goodman, or it was not.

If the former is true, then there is a written agreement that satisfies SCR 20:1.5(b)(2). And he is bound by its terms. But if Goodman did not agree to the terms of the Agreement, as his testimony suggested, and he "never signed [that] Agreement," then no written communication confirmed that fees would exceed $1,000.

No doubt exists that Goodman expected the fees would exceed that amount. This understanding was confirmed in his disclosure statement.

Failure to have a writing when the fees are anticipated to exceed $1,000 would violate the Supreme Court Rules. If Goodman takes the position that he did not consent to the 2024 Agreement and that it is not the written agreement between him and the Debtors, then Goodman must self-report to the Wisconsin

33

Board of Professional Responsibility the failure to comply with SCR
20:1.5(b)(2).

## V.    Amount to be Disgorged

While it would be possible to review the time entries on the 2025 and
2026 Statements for all pre-petition work unrelated to the bankruptcy, the
Court declines to do so. It would require further hearings that would force the
Court, the UST, and counsel to spend even more time.

It is clear from prior decisions of this Court and from the foregoing
discussion that various pre-petition services failed to benefit the Debtors. This
includes time transferring Mr. Conway's interest in the Property in an effort to
create a barrier to collection by Greenwich, which was ill-fated and ill-advised,
and suing Greenwich but then failing the most basic step of obtaining proof of
service before filing a default judgment.

The $10,000 paid to Goodman on May 19, 2023, is more than enough
compensation for whatever services were provided up to the petition date. This
includes all services in connection with the preparation of the filing of a
bankruptcy by the Debtors.

The $386.42 paid to Goodman on January 5, 2024, represents an amount
used to pay the filing fee. The Court will not order disgorgement of that
amount.

The record shows there were four post-petition payments made to
Goodman. The payments are:

34

| Date | Post-Petition Payments | Description | Docket Number |
|---|---|---|---|
| 3/5/24 | $150 | Zelle payment to Goodman | Dkt. No. 284-12 (Trial Ex.12) |
| 5/20/25 | $500 | Unspecified "less credit" mentioned in Goodman's Billing Statement dated 5/20/25 | Dkt. No. 284-15 at 1 (Trial Ex.15) |
| 5/20/25 | $2,200 | Unspecified "less credit" mentioned in Goodman's Billing Statement dated 5/20/25 | Dkt. No. 284-15 at 1 (Trial Ex.15) |
| 7/3/25 | $30,000 | Mrs. Conway's wire transfer to Goodman. | Dkt. No. 284-18 (Trial Ex. 18); Dkt. No. 286-4 (Ex. 103 at 2) |

Attorneys filing Chapter 7 cases in this District often begin with a fee in a less complicated case that is less than $2,000. The amount may increase if there are motions for relief from stay, extensions of time needed related to reaffirmation agreements, and similar matters. It is also true that such fee agreements exclude representation in adversary proceedings and in many other contested matters.

There was a benefit to the Debtors in ultimately receiving a discharge. Still, most of the other services provided by Goodman were of little or no value

35

to Debtors. It appears that the payments of $150, $500, and $2,200 were made post-petition from property other than property of the estate.[50]

When an attorney's conduct—such as lack of diligence or other poor service—mostly prejudices the debtors' rights, rather than the rights of the estate, there can be disgorgement. In those instances, the funds are repaid to the debtors. *In re Dean*, 401 B.R. 917, 926 (Bankr. D. Idaho 2008). This is particularly the case when the funds are not property of the estate.

Thus, the Court will not order disgorgement of the $2,850 represented by those three payments. The amount is more than reasonable to compensate Goodman for services to the Debtors in connection with this case and their ultimate receipt of a discharge.

The final post-petition payment is a different matter. Under state law, certain assets are exempt and therefore do not become property of the estate. Wis. Stat. § 815.20 states:

> An exempt homestead . . . selected by a resident owner and occupied by him or her shall be exempt from execution, from the lien of every judgment, and from liability for the debts of the owner to the amount of $75,000 . . . .  The exemption shall not be impaired by temporary removal with the intention to reoccupy the premises as a homestead nor by the sale of the homestead, but shall extend to the proceeds derived from the sale to an amount not exceeding $75,000, while held, with the intention to procure another homestead with the proceeds, for 2 years.

Wis. Stat. § 815.20(1).

---

[50] The schedules reflected only $50 in a bank account on the petition date.

36

The sale of Debtors' homestead was on September 5, 2023.[51] Mrs. Conway argued that her ability to reinvest the proceeds had been hampered by the actions of Greenwich but that it was her intention to use her homestead exemption to procure another homestead. Accepting this testimony, the Court granted her homestead exemption claim.

She received her homestead exemption check on June 19, 2025. The check was for $75,000. Mrs. Conway then wired $30,000 from that check to Goodman on July 3.  In other words, within two weeks this amount was used to pay Goodman instead of buying a home.

Once Mrs. Conway paid Goodman, the $30,000 lost its exempt status. It became property of the estate under section 541(a)(6). "Disgorgement is to the bankruptcy estate if the payment 'would have been property of the estate.'" *In re Berkshire*, No. 25-80366, 2026 WL 622640, at *5 (Bankr. D. Neb. Mar. 4, 2026) (citing 11 U.S.C. § 329(b)(2)).

The $30,000 payment is property of the estate. Goodman has failed to satisfy his burden that the fees were reasonable. It must be disgorged to the estate.

### CONCLUSION

Attorney Goodman violated sections 329(a) and Rule 2016. His fees are unreasonable under section 329(b). Goodman's services are riddled with missteps, deficiencies, poor advice, sloppy representation, unnecessary

---

[51] Dkt. No. 286-5 at 5.

expense, and delays. Such quality is not indicative of an experienced and diligent attorney. Goodman failed to establish the necessity or benefit of work performed and the reasonableness of bankruptcy-related services as listed in either of the fee statements he created.

The Court finds:

1.     Attorney Goodman has failed to meet his burden of proof to establish the reasonableness of his fees.

2.     The fees described in the 2025 and 2026 Statements in anticipation of and in connection with this case are excessive and unreasonable.

3.     Jonathan Goodman must disgorge the $30,000 payment to Brian Hart, the Chapter 7 Trustee.

This decision constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated:  June 5, 2026

BY THE COURT:

Hon. Catherine J. Furay
U.S. Bankruptcy Judge